UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAHMOUD SHABAN AND SONS
CO.,

                    Plaintiff,

          v.

MEDITERRANEAN SHIPPING CO.,
S.A., et al.,

                    Defendants.

11 Civ. 6322

**OPINION**

Before the court are two motions for partial summary judgment.  The
case, which arises under the court's admiralty jurisdiction, concerns
shipments of rice that arrived at their destination contaminated.  Plaintiff,
Mahmoud Shaban and Sons Co., purchased the rice.  The purchase contracts
required the seller, non-party American Commodity Company, LLC ("ACC"), to
have the rice shipped from its facility in Williams, California to Aqaba, Jordan.
At unloading in Aqaba, a number of the rice containers evidenced one or more
of the following problems: foreign odors, water damage, and insect infestation.
The Jordanian authorities deemed the rice in these containers unfit for human
consumption.

     On September 9, 2011, plaintiff brought suit against the companies
responsible for shipping the rice, claiming approximately $1.6 million in

damages.  Defendant Globerunners, a non-vessel operating common carrier, acted as an agent, coordinating the shipment to Aqaba.  Defendant Mediterranean Shipping was the ocean carrier.  Additional defendants are eight Mediterranean Shipping vessels, *in rem*.

On April 21, 2014, plaintiff filed two motions for partial summary judgment pursuant to Federal Rule of Civil Procedure 56.

In the first motion, plaintiff seeks partial summary judgment on the issue of whether it has established a *prima facie* case for liability under the Carriage of Goods by Sea Act ("COGSA").  In the second motion, plaintiff seeks partial summary judgment on the issue of whether defendants are entitled to a liability limitation of $500 per package under COGSA.

The motions are denied.

## Background

Between May and August of 2010, plaintiff purchased 22,000 metric tons of rice from non-party seller, ACC.  The purchase contracts required ACC to package the rice in metric ton tote bags and ship them to Aqaba, Jordan in cargo containers.  To that end, ACC hired defendant Globerunners to coordinate the cargoes' entire journey, including the trucking from ACC's facilities in Williams, California to the port in Oakland, California and the subsequent ocean carriage to Aqaba.  Globerunners, in turn, hired Mediterranean Shipping to transport the cargo by sea from Oakland to Aqaba.

Prior to shipment, a third-party surveyor, OMIC USA, Inc. ("OMIC"), inspected the rice cargoes at ACC's facilities, and issued certain certifications. OMIC issued a "Health Certificate" stating that the rice was "fit for human consumption and free from any harmful material."  OMIC also issued a "Weight, Quality, Quantity, and Analysis Certificate" stating that the rice was "of sound, loyal, and merchantable quality free from weevils/insects at time of shipment and free from foreigner smell."  Also prior to shipment, the United States Department of Agriculture (the "USDA") inspected the rice.  The USDA issued Phytosanitary Certificates attesting that the cargoes had been "inspected and/or tested according to appropriate official procedures and are considered to be free from the quarantine pests, specified by the importing contracting party and conform with the current phytosanitary requirements for the importing contracting party including those for regulated non-quarantine pests."

ACC bagged the rice and loaded them into cargo containers at its facilities in Williams, California.  OMIC conducted an additional, final investigation to ensure that conditions remained adequate at the time that ACC loaded the bags of rice into the cargo containers.  That investigation focused on the outside of the bags of the rice and the inside of the cargo containers.

The shipping containers were then trucked by Globerunners from ACC's facilities to the Port of Oakland.  Globerunners issued bills of lading for the

containers it loaded onto its trucks. These bills contain the statement "clean onboard".

Subsequently, at the Port of Oakland, Mediterranean Shipping loaded the containers onto several of its vessels. Mediterranean Shipping also issued corresponding bills of lading. Some of these bills of lading contain the statement "clean onboard."

The vessels departed from Oakland. During the journey, the containers were "transshipped", or transferred to different Mediterranean Shipping vessels at multiple ports. The points of transshipment varied by cargo container.

All of the containers passed through Panama and the Mediterranean Sea. It appears that all of the containers were transshipped in Panama. Before reaching Aqaba, all of the shipments were transshipped at either Jeddah, Saudi Arabia, or Salalah, Oman. Jeddah and Salalah are more distant than Aqaba. Thus, the ships carrying the rice sailed past Aqaba to other destinations, where the cargoes were transshipped and brought back to Aqaba. Transshipment in Jeddah involved a total geographic deviation of 1,142 nautical miles. Transshipment in Salalah involved a total geographic deviation of 3,886 nautical miles.

At unloading in Aqaba, the cargo was found to be damaged in several ways. The most significant source of damage was insect infestation. About a quarter of the containers contained insects, the vast majority of which were dead. Most of the insects were found outside the bags of rice (i.e., inside the

4

cargo containers but not in the actual bags of rice).  A small number of insects were found inside the bags, laying dead on top of the rice but not infiltrating beneath the rice's surface.

A smaller number of containers, some of which were those containing insects, contained water damage and/or foreign odors.

## Discussion

Summary judgment may be granted when there is no genuine issue as to any material fact, such that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to such a fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.* The non-moving party may not manufacture a dispute through "conclusory allegations or unsubstantiated speculation."  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).  But the evidence should be construed in the light most favorable to the non-moving party, and reasonable inferences should be drawn in favor of the non-moving party.  *Anderson*, 477 U.S. at 255.  Summary judgment, furthermore, is not a "disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

<u>Motion for Partial Summary Judgment on Liability</u>

The controlling law in this case is COGSA, which governs contracts for the carriage of goods by sea between the United States and foreign ports. 46 U.S.C. § 30701.

Litigation under COGSA can involve a multi-stage process in which evidentiary burdens can shift from one party to another. Here, plaintiff seeks partial summary judgment on the initial stage of that burden shifting process, where the issue is whether plaintiff has established its *prima facie* case for recovery. Under COGSA, "[w]hen the consignee proves its *prima facie* case, the burden shifts to the carrier to show that the loss or damage falls within one of the COGSA exceptions set forth in 46 U.S.C. § 1304(2)." *Westway Coffee Corp. v. M. V. Netuno*, 675 F.2d 30, 32 (2d Cir. 1982).

A *prima facie* case for recovery under COGSA is established if plaintiff proves two facts by a preponderance of the evidence: first, that the carrier received cargo in good condition, and second, that the carrier delivered it in damaged condition. *Id.*

The parties do not dispute that the cargoes were delivered to Aqaba in a damaged condition. Therefore the decisive question before the court is whether there is a genuine dispute as to material facts bearing on whether defendants received the cargoes in good condition.

Plaintiff argues on several grounds that undisputed facts show the cargoes were in good condition when received by Globerunners and

Mediterranean Shipping.  First, plaintiff argues that defendants issued "clean" bills of lading, which attest that defendants observed no defects in the cargoes at the time of receipt.  Second, plaintiff argues that various third-party inspections show that defendants received the cargoes in good condition.

Here, the clean bills of lading do not suffice to show the cargoes were in good condition when defendants received them.  Plaintiff admits as much.  *See* Pl. Repl. Mem. in Supp. of Mot. for Partial Summ. Judg. on Liability at 2. Indeed, the cargo containers containing the bags of rice were sealed when defendants issued the bills of lading.  Defendants therefore had no opportunity to observe defects inside the closed cargo containers.  Under these circumstances, the bills reveal very little about the condition of the cargoes, and do not entitle plaintiff to a presumption of the cargoes' good condition.  *See Bally Inc. v. M.V. Zim Am.*, 22 F.3d 65, 69 (2d Cir. 1994).

Since the clean bills of lading do not suffice, plaintiff's motion depends on whether, instead, the third-party inspections show that defendants received the cargoes in good condition.  In this regard, plaintiff brings forth Phytosanitary Certificates issued by the USDA, and health and quality certificates issued by the independent agricultural inspector OMIC.

The USDA inspections occurred before ACC bagged the rice.  The OMIC inspections that led to the issuance of certificates occurred when ACC bagged the rice.  These inspections revealed no defects.  OMIC also conducted a second round of inspections around the time ACC stuffed the bags of rice into the

cargo containers. This second round of OMIC inspections examined the outsides of the bags of rice, and the insides of the cargo containers. This inspection, too, revealed no defects. *See* Pl. Mem. in Supp. of Mot. for Partial Summ. Judg. on Liability at 9-10.

For numerous reasons, plaintiff's evidence fails to eliminate serious doubts as to whether the cargoes were in good condition when delivered to defendants. The USDA only examined samples taken before the rice was bagged. Therefore, its inspection would have missed any contamination introduced later. Similarly, OMIC's certificates of health and quality were based on inspections that occurred at or near the time of bagging, but the bags, tied closed but not sealed airtight, sat in ACC's warehouses for anywhere from two days to two weeks before being loaded into cargo containers. Contamination might have occurred during that time. Finally, OMIC's second round of inspections, occurring around the time of loading, examined only the outside of the bags and the inside of the containers. *See* Pl. Mem. in Supp. of Mot. for Partial Summ. Judg. on Liability at 9-10. These inspections would have missed any problems on the inside of the bags, and might have missed insects flying into the cargo containers while the bags were being loaded.

Defendants offer other arguments and evidence that could lead a reasonable jury to conclude that the rice was already damaged when defendants received the cargoes. For example, the insect infestations occurred in many containers, and involved similar insects. Therefore, a reasonable juror

might infer a likelihood that the infestations occurred at the containers'

common source, namely ACC's facility, rather than during the containers'

divergent journeys, which involved numerous different trucks, vessels, and

ports of transshipment.  Defendants' expert suggests that some of the insects

found in the cargo containers (1) occur only in North America, and (2) are

aquatic insects attracted to light, rather than rice pests.  And ACC's facilities

have irrigation canals that could cause the presence of many such aquatic

insects.  A reasonable jury could therefore conclude that the infestation

occurred at ACC's facilities before the cargo containers were sealed.  For

example, it is possible that many insects were present at ACC's facilities when

the rice bags were being stuffed in the containers, and that insects entered the

containers at that time.

Construed in the light most favorable to defendants, the evidence clearly

shows a genuine dispute as to material facts, including how and where the

insects entered the containers.  Accordingly, a reasonable jury could conclude

that the damage to the cargoes occurred before either Globerunners or

Mediterranean Shipping took control of the cargo containers.

Plaintiff's motion for partial summary judgment as to liability under

COGSA is denied.

*Motion for Partial Summary Judgment on Package Limitation*

Plaintiff seeks separate partial summary judgment declaring that certain

liability limitations under COGSA do not apply in this case.

COGSA limits the liability of a carrier or ship to $500 per package of goods (the "package limitation").  46 U.S.C. 30701, note § 4(5).  The parties do not dispute that COGSA governs the shipments in this case, nor do they dispute the definition of a "package" of cargo.  However, COGSA's package limitation does not apply where a carrier deviates unreasonably from the itinerary on the bill of lading.  *See English Elec. Valve Co., Ltd. v. M/V Hoegh Mallard*, 814 F.2d 84, 89 (2d Cir. 1987).  Plaintiff contends that such an unreasonable deviation occurred here, and defendants argue to the contrary.

Specifically, plaintiff argues that COGSA's package limitation cannot apply because the transshipments at the ports of Salalah and Jeddah were unreasonable geographic deviations.  Plaintiff observes that these transshipments increased the risk of damage in transit by substantially lengthening the cargoes' journeys.

A geographic deviation under COGSA is a departure from the planned or customary course of the voyage.  *See Italusa Corp. v. M/V Thalassini* Kyra, 733 F. Supp. 209, 217 (S.D.N.Y. 1990).  A geographic deviation is unreasonable when it "substantially increases the exposure of cargo to foreseeable dangers that would have been avoided had no deviation occurred."  *General Elec. Co. Intern. Sales Div. v. S.S. Nancy Lykes*, 706 F.2d 80, 86 (2d Cir. 1983).  The determination of unreasonableness "depends upon an assessment of all the surrounding circumstances."  *Id.* at 85.  Courts in this Circuit have found large geographic deviations to be unreasonable under some circumstances.  *See id.*

10

at 84-87 (a carrier that deviated several thousand miles on a journey from Panama to Japan in order to refuel less expensively, thereby risking exposing cargo to inclement weather, deviated unreasonably).

Here, defendants offer sound reasons why the transshipments in Salalah and Jeddah either were not deviations, or were not unreasonable.  First, the evidence suggests Mediterranean Shipping followed its customary routes.  It transshipped the goods at regional hubs, a practice which makes shipping more efficient.  Plaintiff may even have known that the goods would pass through Salalah or Jeddah.  The undisputed facts therefore do not clearly establish that the transshipments entailed deviations under COGSA.  Second, the bills of lading clearly alerted plaintiff that transshipments would occur.  This weighs against the unreasonableness of transshipment at ports more distant than the cargoes' destination.  Third, there is no reason to believe that the transshipments via Salalah and Jeddah caused, or even could have caused damage.  Plaintiff simply offers no plausible theory as to how the detours through Salalah and Jeddah "increase[d] the exposure of cargo to foreseeable dangers that would have been avoided had no deviation occurred".  For these reasons, plaintiff has not given the court sufficient grounds to conclude that the transshipments were unreasonable deviations.

Accordingly, the court denies plaintiff's motion for summary judgment on the issue of package limitation.

**Conclusion**

For the foregoing reasons, plaintiff's motions for partial summary

judgment are denied.  The clerk is instructed to resolve items 92 and 94 on the

docket.

SO ORDERED.

Dated:  New York, New York
        November 14, 2014

Thomas P. Griesa
United States District Judge